UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SARAH KATZ, ON BEHALF OF HERSELF AND
ALL OTHERS SIMILARLY SITUATED,

                    Plaintiff,
                                                06 Civ. 3707 (JGK)
          - against -
                                                OPINION AND ORDER
IMAGE INNOVATIONS HOLDINGS, INC., ET
AL.,

                    Defendants.
_____

JOSEPH RADCLIFFE, ET AL.,

               Third-Party Plaintiffs,

          -against-

MICHAEL PRESTON,

               Third-Party Defendant.
_____

MICHAEL PRESTON,

               Fourth-Party Plaintiff,

          -against-

JOSEPH RADCLIFFE, ET AL.,

               Fourth-Party Defendants.
═════════════════════════════════════════

JOHN G. KOELTL, District Judge:

     There are three motions to dismiss pending before the

Court.  The motions arise from the Amended Counterclaims and

Complaint of the fourth-party plaintiff, Michael Preston,

1

alleging essentially that he was tricked into accepting a
position as CEO of Image Innovations Holdings, Inc. on the basis
of false representations about the company's finances.  Fourth-
party defendants Joseph and Michael Radcliffe, Arthur Gononsky,
and Goldstein Golub Kessler LLP and Eric Altstadter,
respectively, have moved to dismiss the claims under Fed. R.
Civ. P. 12(b)(6).

I

On a motion to dismiss pursuant to Fed. R. Civ. P.
12(b)(6), the allegations in the complaint are accepted as true.
Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir.
1998).  In deciding a motion to dismiss, all reasonable
inferences must be drawn in the plaintiff's favor.  Gant v.
Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995);
Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The Court's
function on a motion to dismiss is "not to weigh the evidence
that might be presented at trial but merely to determine whether
the complaint itself is legally sufficient."  Goldman v. Belden,
754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not
dismiss the complaint if the plaintiff has stated "enough facts
to state a claim to relief that is plausible on its face."
Twombly v. Bell Atl. Corp., 127 S.Ct. 1955, 1974 (2007); see
also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, the Court is not required to accept legal conclusions asserted in the complaint. See Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007); Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002).


II

The following facts are taken as true for purposes of the fourth-party motions, unless otherwise indicated.

The fourth-party plaintiff, Michael Preston, was contacted in February 2005 about becoming CEO of Image Innovations Holdings, Inc. ("Image"), a public company engaged in the business of selling sports and entertainment celebrity artwork and collectibles. Discussions ensued, and continued until Preston entered into a contract to become CEO of Image on April 14, 2005. In the interim, as well as being the prospective CEO of Image, Preston served as a part-time consultant to the company. During this period, Joseph Radcliffe was a controlling shareholder of Image, and his son Michael Radcliffe was a director of Image and CEO of Image's principal operating subsidiary. Arthur Gononsky was a director of Image, and became Chairman on April 5, 2005. Also during this period, Goldstein Golub Kessler LLP ("GGK") was an accounting firm serving as

Image's independent auditor, and Eric Altstadter was the audit partner at GGK who had primary responsibility for the firm's audit of Image. (Am. Compl. ¶¶ 12-21.)

On February 11, 2005, Preston met with Joseph Radcliffe and Clifford Wilkins, a director and shareholder of H.E. Capital, a large shareholder of Image, to discuss the possibility of Preston's becoming the company's CEO. At the meeting, Radcliffe indicated that Image had achieved $6 million in revenues in 2004, even though he allegedly knew this was false. Radcliffe also gave Preston a binder purportedly containing a business plan for Image, but actually containing copies of Image's 10-Qs for 2004 with fraudulent revenue figures, draft financials for 2004 with fraudulent revenue figures, budgets for 2005 and 2006 based on fraudulent revenue figures, and descriptions of future projects for Image that were unrealistic. Radcliffe allegedly knew that the financial information in the "business plan" was false. (Am. Compl. ¶¶ 27-32.)

On March 2, 2005, Preston met again with Joseph Radcliffe and Wilkins to discuss the CEO position. Michael Radcliffe and Gononsky were also present. Joseph Radcliffe and Gononsky expressed enthusiasm for the idea that Preston would become CEO, and allegedly invoked Image's phony achievement of $6 million in revenue in 2004 as a platform for future growth, though they knew this was false. (Am. Compl. ¶ 33.)

On March 16, 2005, Preston met with Joseph Radcliffe and an investment banker whose firm was considering banking with Image. At the meeting, Radcliffe repeatedly made reference to the $6 million revenue figures, while allegedly knowing they were false. That evening, Preston and Radcliffe attended a reception given by Image at which Preston was introduced in his capacity as the incoming CEO to Altstadter. Radcliffe also introduced Preston as the incoming CEO or the new CEO to various business associates at the reception, including the guest of honor, Indianapolis Colts quarterback Peyton Manning. (Am. Compl. ¶¶ 34-35.)

At meetings on March 17, 2005, and April 6, 2005, Joseph Radcliffe again allegedly represented to Preston that Image had achieved at least $6 million in revenues during 2004. The second of these meetings included the above-mentioned investment banker. (Am. Compl. ¶¶ 36-37.)

On April 5, 2005, and again on April 13, Preston visited the offices of Image's principal operating subsidiary. At these meetings, Joseph and Michael Radcliffe allegedly represented to Preston that Image had achieved at least $6 million in revenues during 2004, even though both Radcliffe defendants allegedly knew that this was false. Joseph Radcliffe made the same misrepresentation to Preston again at an April 11 meeting. (Am. Compl. ¶¶ 38-39.)

Preston alleges that in agreeing to become CEO of Image, he reasonably relied on the representations of the Radcliffe defendants and Gononsky concerning the company's financials. The Radcliffe defendants and Gononsky allegedly made these fraudulent representations in order to induce such reliance, because they wanted to induce Preston to accept the CEO position. They hoped to use Preston's good reputation to lend credibility to Image, especially before the April 15, 2005 deadline for filing the company's 10-K, so that they could extend their scheme of selling the company's stock at inflated prices, or in the case of Gononsky, buying shares of Image and wiring the payment to its principal subsidiary. (Am. Compl. ¶¶ 41-44.)

During the period from March 16, 2005, to April 15, 2005, GGK and Altstadter also allegedly represented to Preston that Image had at least $6 million in revenues for the year 2004. This representation was not intentionally fraudulent, but it was negligent. The mistake would not have occurred if GGK and Altstadter had performed their audit of Image in accordance with Generally Accepted Auditing Standards (GAAS), which they failed to do. GGK and Altstadter failed to detect material misrepresentations in Image's financial statements for 2004. (Am. Compl. ¶¶ 47-48.)

Preston was introduced to Altstadter at the March 16, 2005 reception for Peyton Manning. At the reception, Preston and Altstadter discussed Image, its financial performance, and its management. Altstadter stressed that the question of finding a new CFO should be addressed soon after Preston was appointed CEO. Altstadter indicated that GGK would likely be able to give an unqualified, clean opinion of Image in the company's upcoming 10-K, but that it was important that Preston be "on board" in time to sign the 10-K. Altstadter also expressed concern about Image's ability to file its 10-K on time; failure to do so would likely harm the company's stock price. Altstadter urged Preston to ensure that the 10-K was filed by the April 15, 2005 deadline, and that Preston was in place to sign the form as CEO by that time. (Am. Compl. ¶¶ 51-53.)

From March 16, 2005, until April 15, GGK knew that Preston, in his capacity as "the person who was considering taking on the position of CEO and signing the 10-K in such capacity," was included in the distribution lists for all items circulated by Image's CFO and its securities attorneys relating to the upcoming 10-K and financial report. During this time period there were also communications between GGK and Preston regarding Image's financial condition and the 10-K and financials for the year 2004, none of which reflected any change from Altstadter's statement to Preston at the March 16 reception that GGK would

likely be able to give a clean opinion of Image.  The communications between GGK and Preston included draft financial statements and audit reports prepared by GGK, none of which reflected discomfort with reporting $6 million in revenues. (Am. Compl. ¶¶ 56-60.)

On April 12, 2005, a manager at GGK sent an email to Image's CFO attaching a Management Representation Letter and stating that it had to be signed by the CEO of Image before GGK could issue its report on the financials.  The email asked that the letter be signed as soon as possible.  GGK also sent the letter to Preston; the letter referred to Preston as the CEO of Image, although Preston did not become CEO until April 14, 2005. Preston alleges that this reference reveals that GGK knew that it would not be paid its fee unless it satisfied Preston regarding the financials by the April 15, 2005 deadline.  (Am. Compl. ¶¶ 61-62.)

On April 13, 2005, GGK made its presentation to the Audit Committee.  The presentation did not reflect any discomfort with the draft accounts reflecting over $6 million in revenues, and stated that GGK would be able to give a clean opinion.  By April 14, Preston had been advised by GGK and Altstadter that GGK had finished auditing Image's financial statements for 2004 and that GGK was going to issue a clean opinion.  According to Preston, GGK gave Preston and the securities attorneys the final version

of the financial report before Preston officially signed on as CEO of Image. Preston alleges that he reasonably relied on the representations of GGK and Altstadter in deciding to become CEO of image. (Am. Compl. ¶¶ 63-66.)

On January 3, 2007, the first-party plaintiffs filed an Amended Complaint initiating a purported shareholder class-action suit under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The Complaint named as defendants Image, the Radcliffes, Gononsky, GGK, and others. On April 30, 2007, the Radcliffes answered the Amended Complaint and asserted third-party claims against Preston. On July 16, 2007, Preston answered the third-party complaints against him and asserted counterclaims and a fourth-party action against eight parties, including the Radcliffes, Gononsky, GGK, and Altstadter. Preston asserted causes of action against the Radcliffes and Gononsky for fraudulent inducement, common law fraud, and fraudulent misrepresentation. Against GGK and Altstadter, Preston asserted a claim of negligent misrepresentation. The Radcliffes and Gononsky moved to dismiss on the grounds that Preston had failed to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. Gononsky and Altstadter moved to dismiss on the grounds that Preston had failed to plead the requisite relationship between himself and

GGK and Altstadter to state a claim for negligent

misrepresentation against an accountant on behalf of a non-

client under New York law.  The Court dismissed Preston's claims

against each of the movants without prejudice to the filing of

amended pleadings.  On April 10, 2008, Preston filed his Amended

Counterclaims and fourth-party Complaint, once again asserting

fraudulent inducement, common law fraud, and fraudulent

misrepresentation against the Radcliffes and Gononsky, and

negligent misrepresentation against GGK and Altstadter.

The Radcliffes, Gononsky, and GGK and Altstadter have filed

motions to dismiss for failure to state a claim under Fed. R.

Civ. P. 12(b)(6).  The Court now addresses each of these motions

in turn.

III

A

Joseph and Michael Radcliffe move to dismiss Preston's

fraud claims on the grounds that they are barred by a merger

clause in the Employment Agreement Preston signed when he became

CEO of Image.[1]  Preston argues that the merger clause does not

---

[1] The Employment Agreement provides that "[a]ll controversies or claims arising
out of or relating to this Employment Agreement, or the breach hereof, shall
be subject to the laws of the State of New York. . . ."  (Employment
Agreement ¶ 14.7.)  Accordingly, New York State law governs the fourth-party
motions in this case.  The Employment Agreement is referred to in the Amended

preclude his claims, and that even if it did, the Radcliffes lack standing to invoke the clause.

The merger clause in the Employment Agreement provides:

> This Employment Agreement contains the entire agreement and understanding between the Company [Image] and the Executive [Preston] with respect to the subject matter hereof. No representations or warranties of any kind or nature relating to the Company or its business, assets, liabilities, operations, future plans or prospects have been made by or on behalf of the Company to the Executive.

(Employment Agreement ¶ 14.6.)

The Employment Agreement is signed by Preston and by Gononsky on behalf of Image in his capacity as Chairman of the Compensation Committee.

"[I]t is well established that a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud. However, a party cannot justifiably rely on a representation that is specifically disclaimed in an agreement . . . ." <u>Dallas Aero., Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 785 (2d Cir. 2003) (internal citation omitted) (applying New York State law). The Radcliffes argue that the Employment Agreement specifically disclaims the representations that Preston now claims to have relied on, and therefore Preston cannot state a

---

Complaint and the parties do not dispute that the Court can consider the Employment Agreement in deciding this motion to dismiss without converting it to a motion for summary judgment. <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002); <u>see also</u> <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993); <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47-48 (2d Cir. 1991); <u>VTech Holdings Ltd. v. Lucent Techs., Inc.</u>, 172 F.Supp.2d 435, 437 (S.D.N.Y. 2001).

cause of action for fraud.  See Danann Realty Corp. v. Harris,

157 N.E.2d 597, 599 (N.Y. 1959) ("[Where the] plaintiff has in

the plainest language announced and stipulated that it is not

relying on any representations as to the very matter as to which

it now claims it was defrauded[,] [s]uch a specific disclaimer

destroys the allegations in plaintiff's complaint that the

agreement was executed in reliance upon these contrary oral

representations.") (internal citation omitted).  Preston argues

that his claims are not barred because the merger clause in the

Employment Agreement is boilerplate.  He also argues that his

claims are not barred because the merger clause disclaims only

certain representations, not reliance, and/or because those

representations disclaimed by the merger clause are distinct

from the representations on which he relied.

The distinction Preston attempts to draw between

disclaiming representations and disclaiming reliance is

groundless.  As noted above, the Court of Appeals for the Second

Circuit has held that "a party cannot justifiably rely on a

representation that is specifically disclaimed by an agreement."

Dallas, 352 F.3d at 785.  The clear implication of the Court of

Appeals' language is that a disclaimer of representations also

disclaims reliance on those representations.  Thus, there is no

merit to the argument that the merger clause had to explicitly

disclaim reliance on the representations it disclaimed in order

to preclude Preston's claims.  See also Harsco Corp. v. Segui,
91 F.3d 337, 345-48 (2d Cir. 1996) (affirming dismissal of fraud
and negligent misrepresentation claims based on a disclaimer of
other representations).

In order to preclude Preston's allegations of fraud, the
merger clause must be more specific than a boilerplate
provision, yet broad enough to encompass the representations
Preston claims to have relied on.

To determine whether a merger clause is more specific than
a boilerplate provision, "courts have focused on the extent to
which a merger clause was expressly negotiated by sophisticated
parties using specific language or whether it was merely a
general or standard clause."  Superior Technical Res., Inc. v.
Lawson Software, Inc., 851 N.Y.S.2d 74 (Sup. Ct. 2007) (citing
Citibank, N.A. v. Plapinger, 485 N.E.2d 974 (1985)).  In this
case, Preston has not alleged, nor is there any reason to
believe based on the pleaded facts, that the clause was not
negotiated at arm's length.  Both parties are clearly
sophisticated, and the language used in the clause, which refers
to the "business, assets, liabilities, operations, future plans
or prospects" of Image, is more specific than that typically
used in merger clauses that have been deemed boilerplate
provisions by courts applying New York State law.  See, e.g.,
Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101,

108 (2d Cir. 1998) ("Paragraph 8.13 is a boilerplate merger clause which provides that '[t]his agreement . . . [embodies] the entire Agreement and understanding of the parties hereto' and that '[t]here are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein") (emphases omitted); Fierro v. Gallucci, No. 06 Civ. 5189, 2008 WL 2039545, at *13 (E.D.N.Y. May 12, 2008) (merger clause "contains the standard boilerplate that typifies a general merger clause, and does not contain any language specific to the representations at issue," where it reads: "All prior understandings, agreements, representations and warranties, oral or written, between seller and purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.").

In Leasco Corp. v. Taussig, 473 F.2d 777 (2d Cir. 1972), the Court of Appeals for the Second Circuit found that a prospective purchaser had not been justified in relying on the financial statements provided by the seller to reflect accurately the financial condition of the acquisition company, where the contract "specifically disclaimed any warranties or representations concerning [the acquisition company's] financial condition." Id. at 783. The Court of Appeals pointed to

14

language in the contract providing that the seller "makes no
other representations and warranties with respect to [the
acquisition company] and the business thereof." Id. at 783-84.
The Court of Appeals considered this language specific enough to
preclude claims relating to representations of the financial
condition of the acquisition company, even though the precise
term "financial condition" was not used in the disclaimer. The
Employment Agreement in this case contains an even more specific
disclaimer than that found in Leasco. The merger clause in this
case cannot be characterized as boilerplate, and it is specific
enough to preclude reliance on certain representations.

      The merger clause is also broad enough to encompass the
representations Preston claims to have relied on in this case.
Preston alleges that he relied on misrepresentations with
respect to Image's 2004 revenues and representations that Image
had business opportunities to achieve similar revenues during
2005. Preston seeks to distinguish representations relating to
Image's business, assets, liabilities, operations, and future
plans or prospects, which are disclaimed in the merger clause,
from representations of Image's revenues and prospects for
future revenues, on which he claims to have relied. The absence
of the term "revenues" in the merger clause does not mean that
representations as to revenue were not disclaimed.
Representations as to revenue are fairly encompassed in the

disclaimer of representations as to business, assets,

liabilities, operations, and future plans or prospects.

Moreover, the alleged representations with respect to prospects

for future revenues plainly were encompassed in the disclaimer

of representations as to future plans or prospects.  Indeed, the

Amended Complaint describes the alleged misrepresentations

broadly as representations "with respect to the financial

affairs and business prospects of Image.").  (Am. Compl. ¶ 25.)

It is plain that a merger clause may disclaim reliance on

certain representations without identifying those

representations in language that is identical to the language

used by a party claiming reliance.  See, e.g., Leasco, 473 F.2d

at 783-84 (reliance on representations of financial condition

precluded by disclaimer of reliance on representations relating

to the business of the entity in question); Wells Fargo Bank

Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F.Supp.2d 352,

368-69 (S.D.N.Y. 2002) ("Applying [New York law], it is clear

that the exact words 'maintenance costs' need not appear in the

disclaimer in order for representations about maintenance to

have been disclaimed . . . . It does not follow . . . that where

a written contract specifically identifies areas that are not

the subject of representations, a party can avoid its

specifically-negotiated contract obligations by claiming a

representation that is a slight variant of the particular

language disclaimed in the contract."). In this case, revenues are logically an aspect of Image's business, assets, liabilities, operations, and future plans or prospects, as to which representations have been disclaimed. Thus, the merger clause encompasses the representations on which Preston claims to have relied.

Because the merger clause in the Employment Agreement is both more specific than a boilerplate provision and sufficiently broad to cover representations as to revenue, the clause precludes Preston from relying on those representations of Image's financial condition that he claims to have relied on, and therefore bars his fraud claims.[2] See, e.g., Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1373 (N.Y. 1996) (in action for fraud, plaintiff must show justifiable reliance).

Preston argues that the Radcliffes lack standing to invoke the merger clause against his claims, because the Employment Agreement was between Preston and Image, and the Radcliffes were

_____

[2] Under New York law "[t]here is one long-recognized exception to this rule – the peculiar-knowledge exception. That exception holds that if the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations." Warner Theater Assoc. Ltd. P'ship v. Metro. Life Ins. Co., 149 F.3d 134, 136 (2d Cir. 1998). Preston does not make any argument that the exception should apply in this case, nor does he plead any facts to show that information relating to Image's financial condition was peculiarly inaccessible to him during the period when he was contemplating signing an agreement to become CEO. On the contrary, Preston's Complaint and moving papers suggest that he essentially took at face value, without any attempt at further investigation, the revenue figures mentioned to him by the Radcliffes and other representatives of Image. Therefore, the peculiar-knowledge exception does not apply to this case.

not parties to the agreement.  This argument is unavailing.  The merger clause of the Employment Agreement disclaims representations "made by or on behalf of the Company to the Executive."  (Employment Agreement ¶ 10 at 14.6.)  The Complaint makes clear that any representations made by the Radcliffes as to the financial condition of Image were made on behalf of Image.  During the recruitment of Preston the Radcliffes functioned as representatives of Image who stood to gain from the hiring of Preston in their capacity as shareholders of Image.  (See, e.g., Am. Compl. ¶ 35 ("Preston's prospective appointment seemed to be important to Image's immediate audience"); ¶ 41 ("Joseph Radcliffe . . . and Michael Radcliffe benefited from sales of stock of Image at inflated prices"); ¶ 42 (the Radliffes hoped to "us[e] Preston's reputation and credentials to create an illusion that Image was a well managed business").)  In such circumstances, corporate representatives may invoke the protection of a merger clause in an agreement between their corporation and a plaintiff who brings fraud claims against the officers.  See Vesey Associates, Inc. v. Regime Realty Corp., 232 N.Y.S.2d 754 (Sup. Ct. 1961).  In Vesey, the court distinguished cases where the misrepresenting party functions as a mere broker of a deal between a corporation and a plaintiff, such as Wittenberg v. Robinov, 173 N.E.2d 868 (N.Y. 1961), and cases where the misrepresenting party functions

as a corporate agent.  In cases belonging to the latter

category, the misrepresenting party may rely on a merger clause

in an agreement signed by the corporation.  Id.  This is plainly

such a case.  Preston has not alleged any facts to indicate that

the Radcliffes would receive a commission for bringing him on

board as CEO of Image, or that they were functioning as mere

brokers in any other way.  On the contrary, the Complaint makes

plain that the Radcliffes were operating as corporate insiders

at Image who hoped to benefit in that capacity from the hiring

of Preston.  Therefore the Radcliffes could properly invoke the

protection of the merger clause with respect to the

representations at issue.

For all of the reasons explained above, Preston's various

fraud claims against Joseph and Michael Radcliffe are barred by

the merger clause in the Employment Agreement between Preston

and Image.

B

Like the Radcliffes, Arthur Gononsky moves to dismiss

Preston's fraud claims against him on the grounds that they are

barred by the merger clause in the Employment Agreement.  The

analysis with respect to Gononsky's motion is the same as the

analysis with respect to the Radcliffes' motion.  Therefore, for

the reasons explained above with respect to the Radcliffes'

motion, Preston's fraud claims against Gononsky are barred by
the merger clause in the Employment Agreement between Preston
and Image.


C

GGK and Altstadter move to dismiss Preston's negligent
misrepresentation claim against them on the grounds that Preston
has not alleged facts sufficient to show that as Image's
accountant during the period in which Image was recruiting
Preston to become CEO, GGK owed a duty of care to Preston.[3]
Preston argues that a duty of care arose from the relationship
between Preston and GGK.

Under New York law, an accountant owes a duty of care only
to those parties with whom it is in a relationship of privity or
"near privity." DaPuzzo v. Reznick Fedder & Silverman, 788
N.Y.S.2d 69, 71 (App. Div. 2005). Determining what constitutes
"near privity," also referred to as "a relationship sufficiently

---

[3] The analysis of GGK's potential liability to Preston for purposes of the
motion to dismiss also encompasses Altstadter's potential liability to
Preston. Under New York Law, a partner in a limited liability partnership is
personally accountable for any negligent act committed by him or any person
directly under his supervision and control while rendering professional
services on behalf of the partnership. N.Y. Partnership Law § 26(c)(i). In
this case, Altstadter was a partner at GGK, a limited liability partnership.
Altstadter was the partner assigned to complete Image's audit, and therefore
the alleged negligence in the conduct of the audit would be attributable to
him. In addition, the majority of the contacts alleged in the Complaint to
have taken place between GGK and Preston involved Altstadter as the
representative of GGK. Therefore, GGK and Altstadter are treated as a single
party here. Preston treats GGK and Altstadter as a single party in his
opposition papers (referring to them jointly as "GGK/Altstadter"), and GGK
and Altstadter do not raise any objection to this treatment in their reply
papers.

intimate to be equated with privity," "the practical equivalent of privity," and "a relationship so close as to approach that of privity," Credit Alliance Corp. v. Arthur Anderson & Co., 483 N.E.2d 110, 112, 115 (N.Y. 1985) (internal quotation marks and citation omitted), has not been reduced to an exact science. The New York State Court of Appeals has identified three criteria for "near-privity": "Before accountants may be held liable to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." Credit Alliance, 483 N.E.2d at 118; see also BHC Interim Funding, LP v. Finantra Capital, Inc., 283 F.Supp.2d 968, 984 (S.D.N.Y. 2003).

Credit Alliance consolidated two appeals, both of which raised the issue of an accountant's duty of care to a non-client. The court resolved the two appeals in opposite ways. In the first appeal ("Credit Alliance"), the facts as alleged demonstrated that the defendant accountant's client had sought to induce the plaintiff to extend credit to it, in part by

showing the plaintiff the accountant's reports with the
intention that the plaintiff would rely on them.  The plaintiff
also alleged that the accountant either knew or should have
known that the plaintiff was being shown the reports for the
purpose of inducing the plaintiff's reliance on them.  Credit
Alliance, 483 N.E.2d at 111-13, 119.  However, the court held
that a relationship approaching privity had not been shown,
noting that "no claim is made that [the accountant] was being
employed to prepare the reports with that particular purpose
[inducing the plaintiff's reliance] in mind."  Id. at 119.  The
court also cited the lack of any allegation that the accountant
"had any direct dealings with plaintiffs . . . . [T]here is
simply no allegation of any word or action on the part of [the
accountant] directed to plaintiffs."  Id.

    In the second appeal ("European Am. Bank and Trust Co. v.
Strauhs & Kaye," 483 N.E.2d 110 (N.Y. 1985), or "European
American"), the alleged facts were similar, with the exception
that the defendant accountant had been "well aware that a
primary, if not the exclusive, end and aim of auditing its
client . . . was to provide [the plaintiff-lender] with the
financial information it required . . . . [T]he complaint and
affidavit here allege both the accountants' awareness of a
particular purpose for their services and certain conduct on
their part creating an unmistakable relationship with the

                              22

reliant plaintiff." Id. at 120 (emphasis in original). In
holding that a relationship approaching privity between the
plaintiff and the accountant had been adequately alleged, the
court noted that "direct communications and personal meetings"
had taken place between the two, "for the very purpose of
discussing [the client's] financial condition and [the
plaintiff's] need for [the accountant's] evaluation." The court
concluded: "The parties' direct communications and personal
meetings resulted in a nexus between them sufficiently
approaching privity . . . to permit [the plaintiff's] causes of
action." Id.

        The facts alleged in this case are far closer to those in
Credit Alliance than the factual allegations in European
American. It cannot plausibly be alleged that GGK was engaged
for the end and aim of providing audited financials to Preston.
Indeed, the Amended Complaint asserts that GGK was auditing
Image's financial statements for the year ended December 31,
2004, beginning February, 2005, for inclusion in Image's 10-K to
be filed with the Securities and Exchange Commission. (Am.
Compl. ¶ 22.) The first and indeed only specific meeting
alleged between Preston and GGK partner Altstadter was at a
reception for Peyton Manning on March 16, 2005. (Am. Compl. ¶
35.) And it was Preston who was required to provide to GGK a
management representation as to the validity of the financials

before GGK would provide its audit opinion in the financials. (Am. Compl. ¶¶ 61-64, 70.)  It would turn the relationship of GGK and Preston on its head to find a plausible allegation that an end and aim of GGK's engagement was to provide financials to Preston when the Amended Complaint plainly and plausibly alleges that it was a pre-condition of GGK's clean audit opinion that it receive a management representation letter from Preston.

The alleged communications between GGK and Preston that took place after the Peyton Manning reception, and the inclusion of Preston on emails containing GGK's draft financial reports, do not change the analysis.  There is no allegation that Preston's "need for [GGK's] evaluation" of Image's financials in deciding whether to become CEO was ever discussed, acknowledged, or understood by GGK and Preston, and there is no plausible claim that GGK understood an end and aim of preparing Image's financials was to include Preston's reliance on them, or to induce through such reliance his agreement to become CEO.  See Sec. Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co., 597 N.E.2d 1080, 1085 (N.Y. 1992) (characterizing communication from accountant to plaintiff that "nothing untoward had been uncovered in the course of the audit [of the accountant's client] and that an unqualified opinion would issue" as "limited to generalities" and insufficient to establish a relationship approaching privity) (internal quotation marks and citation

omitted); Houbigant, Inc. v. Deloitte & Touche LLP, 753 N.Y.S.2d
493, 495 (App. Div. 2003) (no relationship approaching privity
where accountant consented to client forwarding a copy of its
financials to plaintiff and accountant knew that plaintiff would
rely on the information, where audit was conducted "pursuant to
professional standards applicable in the context of any audit,
and was not undertaken pursuant to any duty owed toward"
plaintiff).

The cases cited by Preston to support his argument do not
suggest a different conclusion. Aside from European American,
the only case cited by Preston in which a court held that an
accountant could be liable for negligence to a third party
because of a relationship approaching privity is Dinerstein v.
Anchin, Block & Anchin, LLP, 838 N.Y.S.2d 46 (App. Div. 2007).
In Dinerstein, the Appellate Division affirmed the denial of
summary judgment to an accountant sued for malpractice by a
plaintiff, who was a stockholder and director of the
accountant's client, and who had served as a guarantor for the
accountant's client. But in that case, the accountant was aware
"at the time it began its audits" of the client that the
plaintiff was already functioning as a limited guarantor for the
client, and the court considered it foreseeable by the
accountant that the plaintiff would soon have to extend a full
guaranty, for which it would "rely upon the defendant's audit

reports." Id. at 47. The accountant in Dinerstein also knew as a general matter that its audit reports, which were addressed to the stockholders and directors of the client, "were to be used by [the client's] stockholder . . . for the particular purpose of managing and overseeing [the client's] business," and the plaintiff in the case was a stockholder and director. Id. (internal quotation marks omitted). Thus the circumstances in Dinerstein, from which the court inferred a relationship approaching privity, are very different from the facts in this case, in which there is no allegation that GGK had any knowledge regarding Preston, or even knew who Preston was, at the time it began its audit and its preparation of Image's financial papers for the year 2004, and in which Preston made management representations to GGK to obtain its audit opinion on the financials.

For the foregoing reasons, Preston has failed to establish a relationship with GGK sufficient to support his negligent misrepresentation claim.

CONCLUSION

For the reasons explained above, the motions to dismiss by fourth-party defendants Joseph and Michael Radcliffe, Arthur

Gononsky, and GGK and Eric Altstadter are **granted**. The Clerk is directed to close Docket Nos. 152, 160 and 164.

**SO ORDERED.**

**Dated: New York, New York**
      **November 3, 2008**

John G. Koeltl
United States District Judge